CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

March 27, 2025

LAURA A. AUSTIN, CLERK
BY:  s/J.Vasquez
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **ARTHUR JONES,** | ) | |
| **Petitioner,** | ) | **Civil Action No. 7:22cv00685** |
| | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| **WARDEN, BUCKINGHAM CORR. CTR.,** | ) | **By:  Robert S. Ballou** |
| **Respondent.** | ) | **United States District Judge** |

Arthur Jones, a Virginia inmate proceeding *pro se*, has filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his Radford County Circuit Court convictions and 29-year active sentence for 68 counts of carnal knowledge.  The respondent has filed a Motion to Dismiss, and the matter is now ripe for decision.  Upon review of the complete record in the state criminal case and state habeas case, the court concludes that the respondent's motion must be granted for the reasons stated below.

### I.  BACKGROUND AND PROCEDURAL HISTORY

On January 12, 2014, Radford Police arrested Jones for 23 counts of carnal knowledge of a 13-year-old girl, in violation of Va. Code § 18.2-63(A), and 2 counts of indecent liberties with a minor, in violation of Va. Code 18.2-370, all alleged to have occurred between December 2, 2013, and January 10, 2014.  Following a preliminary hearing on April 30, 2014, in the Radford Juvenile and Domestic Relations Court, the matters were certified to the grand jury, which indicted him on all charges on June 13, 2014.  On September 12, 2014, the grand jury issued direct indictments against Jones for 45 additional charges of carnal knowledge and 19 additional charges of indecent liberties with a minor, during the same date span, plus 3 counts of possession of child pornography, in violation of Va. Code § 18.2-374.1:1, and one count of using of a computer communication system to solicit a minor, in violation of Va. Code § 18.2-374.3.  On

December 12, 2014, the grand jury indicted Jones for three counts of enticing a child to perform in child pornography in violation of Va. Code § 18.2-374.1. Trial R.[1] at 1–119, 169–238, 387–389.

## A.  The Trial Court

### 1.  Pretrial Motions

On January 8, 2015, the court heard argument on several motions filed by defense counsel:  Motion for change of venue; motion to recuse the Commonwealth's Attorney and to get the court's permission to subpoena the Commonwealth's Attorney as a witness for trial because of his participation in the interrogation when the victim changed her account of events significantly; motion to appoint a guardian *ad litem* for the 13-year-old alleged victim; motion to declare the carnal knowledge statute unconstitutional as applied if the defense is precluded from relying on mistaken belief about the victim's age; and motion to suppress Jones' un-*Mirandized*[2] statements to police.  Comb. Tr. of Mots, Plea, and Sent. Hrgs (hereafter, "Comb. Tr.") at 3, ECF No. 9-4 at p.5.  The court denied the motion to recuse the prosecutor and subpoena him for trial. *Id.* at 11.  He took the remaining motions under advisement, indicating that he would issue a written opinion.  *Id.* at 118.  Ultimately, all were denied except for the motion to appoint a guardian *ad litem*.  Trial R. at 496–501.

Approximately one week after the motions hearing, the Commonwealth communicated a plea offer to counsel.  At a hearing on January 30, 2015, Jones testified that counsel had come to the jail and gone over the plea offer "fully and completely" with him, and that he had decided for

---

[1] Citations herein to "Trial R." refer to the records of the Radford Circuit Court in Jones' criminal case file, using the handwritten numbers in the bottom center of each page.

[2] In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court announced a rule requiring officers to advise suspects of their right to remain silent and right to have an attorney before conducting custodial interrogation. When such warnings have been given, a defendant has been "*Mirandized.*"

himself to reject the plea offer, without any force or duress from counsel.  Comb. Tr. at 123-124.
After placing that matter on the record, defense counsel argued to dismiss the three indictments
issued on December 12, 2014, for enticing a minor to perform in child pornography, on the
grounds of prosecutorial vindictiveness.  The defense noted that the grand jury indicted on those
three offenses just four days after the defense filed the numerous motions later argued on January
8, and that the three charges carried 35 years of mandatory prison time.  In particular, counsel
stressed that one of the motions had been to disqualify the prosecutor, which may have been the
motive for filing additional charges.  The prosecution represented to the court that he attended a
conference at the end of September in which the enticement statute was brought to his attention,
and that is when he decided to indict Jones on those charges.  Because Radford holds grand jury
only four times per year, the next grand jury date was December 12, but the proposed
indictments were drafted in late September, long before the defense motions were filed.
Accepting the prosecution's representation, the court overruled the motion.  *Id.* at 127–128.

    2.  The Plea: Colloquy and Evidence

    On February 4, 2015, the date scheduled for Jones's jury trial, the parties reached a verbal
plea agreement.  At the beginning of proceedings, the Commonwealth's Attorney advised the
court that he would be moving at the end of the plea proceedings to *nolle pros*[3] the 22 indecent
liberties charges, the solicitation charge, the three counts of possession of child pornography, and
the three enticement charges.  *Id.* at 136.  Jones then pled guilty to the 68 charges of carnal
knowledge.  Before accepting the plea, the court engaged in a lengthy colloquy with Jones, the
relevant parts of which follow:

---

[3] "*Nolle pros*," a shortened form of the Latin phrase "*nolle prosequi*," refers to the Commonwealth's
decision to dismiss the charges.

Q. [by court]:  Are you the person charged in the 68 indictments with the commission of the offense of carnal knowledge of a minor, in violation of Virginia Code Section 18.2-63?

A.  Yes, I am, Your Honor.

Q.  Do you fully understand the 68 charges pending against you?

A.  I do, Your Honor.

Q.  Have you discussed those charges and their elements with your attorneys?

A.  I have, Your Honor.

Q.  Do you understand what the Commonwealth must prove before you may be found guilty of these 68 charges?

A.  I do, Your Honor.

Q.  Have you had enough time to discuss with your attorneys any possible defense which you might have to these 68 charges?

A.  I have, Your Honor.

Q.  Have you discussed with your attorneys whether you should plead guilty, not guilty, or *nolo contendere*?

A.  I have, Your Honor.

Q.  And after your discussion, did you decide for yourself what you should plead, Mr. Jones?

A.  I did, Your Honor.

Q.  And what did you decide to plead to these 68 charges?

A.  Guilty, Your Honor.

Q.  Are you entering your pleas of guilty freely and voluntarily?

A.  I am, Your Honor.

Q.  Mr. Jones, are you entering your pleas of guilty because you are, in fact, guilty of the crimes charged?

A. Yes, Your Honor.

Q. Do you understand that because of your pleas of guilty you waive certain constitutional rights?

A. I do, Your Honor.

Q. Do you understand that you waive your right to trial by jury?

A. I do, Your Honor.

Q. And that would consist of 12 people from the community who would have to unanimously find you guilty, and you wish to waive this right?

A. I understand, Your Honor, yes.

Q. Are you certain that you wish to waive this right to trial by jury?

A. Yes, Your Honor.

Q. Mr. Jones, I can bring in a jury today to hear these cases. Wouldn't you want a jury to hear these cases?

A. No, Your Honor.

Q. And you wish to waive your constitutional right to trial by jury?

A. I do, Your Honor.

Q. Do you also understand that by your pleas of guilty, you waive your right not to incriminate yourself?

A. I understand, Your Honor.

Q. Do you understand that you waive your right to confront and cross-examine your accusers?

A. I understand, Your Honor.

Q. And do you also understand that you waive your right to defend yourself?

A. I understand, Your Honor.

* * * *

Q. Has anyone connected with your arrest and prosecution, such as the police or the Commonwealth's Attorney, or any other person in any manner threatened you or forced you to enter your pleas of guilty today?

A. No, Your Honor.

Q. Have they made any promises to you concerning your pleas of guilty?

A. No, Your Honor.

Q. Do you understand that the maximum punishment as to each charge is up to 10 years in the Virginia Department of Corrections and/or a fine of up to $100,000 on each?

A. I understand, Your Honor.

Q. So, in other words, Mr. Jones, this Court can impose a maximum sentence for you to serve of 680 years, do you understand that?

A. I do understand, Your Honor.

Q. Are you further aware that there are other consequences that may apply if you're convicted of these felonies?

A. I do, Your Honor.

* * * *

Q. Because of the 68 charges in which you are pleading guilty to, Mr. Jones, are (sic) carnal knowledge of a minor, in violation of Virginia Code Section 18.2-63, do you understand that you would be required to register as a violent sexual predator?

A. I understand, Your Honor.

* * * *

Q. Have you discussed the sentencing guidelines with your attorneys, Ms. Bennett and Mr. Broccoletti?

A. I have, Your Honor.

6

Q.  Do you understand this Court is not required to follow those guidelines; I can impose the maximum sentence for you to serve of 680 years?

A.  I understand, Your Honor.

Q.  Are you further aware that there is no parole in the Commonwealth of Virginia?

A.  I understand, Your Honor.

Q.  Ms. Bennett and Mr. Broccoletti have been your attorneys throughout these proceedings; are you entirely satisfied with their services?

A.  Absolutely, Your Honor.

Q.  Do you understand, Mr. Jones, that by your pleas of guilty, you may waive any right to appeal the decision of this Court?

A.  I understand, Your Honor.

Q.  Have you entered into a written plea agreement with the Commonwealth's Attorney in this case?

A.  No, sir, Your Honor.

Q.  Did you understand all the questions I asked?

A.  I have, Your Honor.

Q.  Have you answered all my questions truthfully?

A.  I have, Your Honor.

*Id.* at 138–142.

After finding Jones' plea to be freely, voluntarily, and intelligently made, the court asked the Commonwealth's Attorney to summarize the evidence that would have been presented if the case had gone to trial.  The prosecutor responded as follows:

. . . Your Honor, the Commonwealth's evidence in this case would be testimony primarily from the complainant child, who is identified as, as K.T.  To begin with, one of the Commonwealth's exhibits

7

would be, in fact, her birth certificate, either through her testimony or her mother's, established the fact that she was born in Florida on the date of September 7th, 2000. One of our exhibits we would ask the Court to receive today is this birth certificate.

. . . .

Next would be a picture that, again, through the victim's testimony, establishes that in October of 2013, she had a picture taken of her, which was the day she got her braces off. This photograph is color; it's a letter-sized piece of paper, and it's an accurate reflection of how she appeared in the fall of 2013. We would ask that that be one of our exhibits.

. . . .

The victim in this case would testify to essentially establishing who she is, what she does, interests, hobbies, grades, and so forth. We would, we would next begin testifying about how she got on the internet. She, at about the age of 11, through curiosity and, and, and some prodding by friends, she decided to get on some adult websites that are for meeting dates—Matchmaker, (inaudible)only.com, those kinds of websites, some of them more sexual in their focus. She did – she was given a cell phone and an iPod when she was 11 and 12, and little by little she created fake personas on the internet, at least one of them claiming she was a 23-year-old graduate of the University of Florida. This escalated into the fall of 2013 where, at some point, she meets the defendant in this case. She thought his name was Ryan; and, in fact, through the conclusion of this relationship that the Court's going to hear about, she still thought his name was Ryan through the entirety of the episode you're about to hear. At this point, the defendant contacted her first through one of these websites. They began to chat, exchange texts; eventually photographs begin to get exchanged between the two. And, again, the defendant was under the impression that he was talking to someone who was older than she actually was. She would be 13 at the time this was actually happening. At some point in the month of November, the complainant, the victim in our case, would tell this Court or a jury that the defendant asked her to take a couple of provocative pictures of, of private areas, and he wanted his name written on her body in these selfies so that he could establish and verify, in fact, they were real and that that's her in the pictures. I have three colored photographs I would ask the Court to accept as one of our exhibits, three colored photographs that show just that, three various body parts with Ryan written in black marker.

. . . .

We would establish at trial, if we had had to, that these photographs
were brought into our city, not on the defendant's phone to be quite
candid, but in fact, these were recovered from the victim's phone by
one of our police officers. They had been deleted. Next, we would
begin testimony in talking to the judge or the jury in this case about
how they first met. Arrangements were made to meet. The child in
this case was to sneak out of her house after her mother went to bed.
She lives with her brother, who is 17 now, and, and her mother. Her
parents were recently separated, so her father was not under the roof
at – any longer. She did, however, have periodic visitation dates
where she would go to her father's, and these would usually fall on
a Saturday into a Sunday. During the month of December 2013, this
child snuck out almost every night. Their first meeting was
December 2nd, the morning of December 2nd, from around 12:30
to, say, 3:00 in the morning. She was taken back to the defendant's
home, which is . . . here in the City of Radford. And we have a series
of photographs and ask the Court to accept the one-page, nine-
photograph, black and white piece of paper that is a few pictures of
his house and a few pictures of the victim's home, as one of our
exhibits.

. . . .

On their very first meeting, she's taken back to his house, and sexual
intercourse is attempted. Our victim would testify that his – the
defendant's penis was inserted into her vagina, but it didn't, it didn't
fit; it didn't go in all the way; it was in partially. They did not
complete the act of sexual intercourse that particular night. She was
asked to perform fellatio; she declined that offer. However,
cunnilingus and digital penetration were performed on her by the
defendant. And over the next two weeks, this happened almost
every night. With the exception of just a few breaks, cunnilingus
was performed 20 times over the next 40 days. Twenty-two times
over the next 40 days, digital penetration would occur. Sixteen
times over the next 40 days – eventually, on December 10th, the
victim finally does acquiesce and does actually perform oral sex for
the defendant. That's the first time she had ever done that, and she
proceeds to do that 16 times over the remaining 30-some days.
Sexual intercourse is first completed all the way through – after
some efforts and attempts to try to complete this, finally it's
completed on December 18th of the year 2013. Ten occasions, they
had sexual intercourse. There were many occasions where all four
acts would happen in succession, in various orders. The victim goes
with her family to Florida for about 12 days. Their family packs up

and goes to Florida every Christmas to see family.  They leave on December 21st and come back on January 3rd of 2014.  During that period of time, she did not rendezvous or sneak out and sneak back in and meet with this defendant.  So, out of the 40 days, you take out those, she had 22 trips to the defendant's home.  The last one which we will talk about in depth is January 10th of 2014.  That's how they meet.  The, the return was done – usually the defendant – of course, the defendant had to be driving her all the time; she does not have a driver's license; she does not have a car.  She was sneaking out and sneaking back in, all before sunrise.  Her mother gets up very, very early to go to work, so she had to be back home and in her bed around 4, 4:30, or this – her cover is blown.  During that, that 40-day period of time where, where she was sneaking out, she actually had a friend cover for her.  She had a friend who she said, can I tell my mom I'm spending the night at your house and you be my cover?  And, so for several of these nights where she was gone, her mother thought she was actually spending the night at her friend's house.  There were very – sometimes there were very – there were almost no gifts.  There was a – a Tim Tebow Florida Gators jersey was, was given to her as a gift.  That may have been one of our exhibits.  There was (sic) no cards, no jewelry, and only one or two dinners out.  They ate – they went through the drive-thru once at a Chick-Fil-A, and they ate at Applebee's on that last night, that January 10th afternoon we will talk about later.  They never double-dated; they never ran into friends of his or hers.  At some point, she does tell him – this was before they first meet – there's text messages we'll talk about a little bit later where she actually tells him, I'm not 23.  I've got to tell you something, I'm not 23, I'm 18.  And this story remains 18 for the rest of their relationship.  She never changes off that.  She insists she's 18, and the, and the defendant believes such or has no other reason – he's not told otherwise, is what I'll say.  He's not told otherwise through this relationship.  The sex acts that I just described would be, again, gone over, and we would lay out somewhat of a calendar.  The, the, the victim in this case did create kind of a calendar.  She had to go back, but with her parents' help they put in here the weekends that were at her dad's, a couple of days where she remembers she was on her menstrual cycle, and the vacation I mentioned where she went to Florida.  And with their help and hers, they came up with a chart, and I'd ask the Court to receive as an exhibit – it's just a chart that memo – documents the 40 days as I've just described them.

. . . .

In this segment of the victim's testimony, we would talk about things like birth control, and there, there was no birth control used.  The

victim in this case would tell the, the trier of fact that she was concerned about birth control and asked the defendant about it, but that they never went any further in exploring it. The defendant did not use a condom on all of these occasions. It may not need to be said, but I'll say it – the defendant had to teach, or did instruct, the victim in this case how to perform lots of these sex acts. She had never done any of these things before and was instructed through trial and error to, to get to the point where she could do all of these things. I mentioned the photographs. This occurred in our city; there's no question that [defendant's address] is in our city. There, there's a segment of testimony where we were going to ask the trier of fact to learn about her emotional state. She was – it would, it would be clear that she was in love with this defendant. She became infatuated and enamored with somebody who had shown her attention, who was treating her like an adult much older than she was. And between the curiosity and the anxiety of worrying about what was taking place as she entered or went through puberty, she began to feel very special about the attention that she received from the defendant; and in the end became almost brainwashed. We would ask the Court to receive as one of our exhibits a Christmas card that was discovered where she talks about, she loves him; she says, happy one-month anniversary, you mean the world to me, I want to be together all the time, love, your girl, and it's signed, your baby girl. We would ask the Court to accept a photocopy of this one-page Christmas card.

. . . .

It was, it was the case that the victim had told at least one or two of her friends that she was sneaking out and seeing an older boy, or an older person, but she thought that the defendant was in his 30's. According to some website that they had met on, she recalls remembering that he said he was in his 30's maybe. There's a series of text messages. What the police were able to do is, is recover some text messages, and the Commonwealth would ask the Court to accept as one of our exhibits 16 pages of text messages that were recovered from a Blackberry that belonged to this defendant.

. . . .

In those text messages, there is a lot of communication, and I encourage the Court between now and May to look through this, if, if inclined. I'm not going to read all of this, or even the highlighted excerpts. What I will tell the Court is that there's a lot of the conversation in here about, are you 18; are you sure you're 18; do you promise me you're 18; if you're not legal, we can't meet. And

11

he asked her for her driver's license and she gives him an excuse that, I failed my driver's license test, failed it twice, in fact. But then there's text messages where the defendant writes, this just isn't adding up; you don't – you only text me late at night, you always have something else to do during the day; we, we only have to meet in the cover of darkness, and this isn't, this isn't indicative of a 23-year-old. And so, he's very, very suspicious of what is taking place, but no verification is ever established in the form of a birth certificate, driver's license, or Social Security number. The defendant did look up her address and found out how to get to her house, but was unable to verify her exact age. These text messages are graphic; our victim did participate in a lot of very graphic sex discussions back and forth, both before they met and even during the relationship. There, there's talk in here about that first attempt to have sex and, and that she went home and was bleeding and stuff. But one last thing I will mention is there's a text message here that was recovered by the police – I think it had been deleted, but we were somehow able to un-encrypt some of these text messages. On, on January 12th, 2014, when the investigation in this case had been brought to the defendant's attention, he says, listen, I love you; you know I love you and I can't imagine life without you, but I need you to delete everything about me except this number, my pics, everything, and change your number; listen, please baby. So then we get to January 10th, and what actually happens the night that this stops.

One of our next witnesses would be Camille Tucker, and she'll testify to the same events that the victim in this case would have testified to. But, in essence, here's what happened. Her cover is blown when her mom goes to Scarrett's movie theater just across the bridge here in Radford. She's there at 9, 9:30 with a date to see a late show. It's January 10th, it's cold out, it's dark out, and the students at Radford University are gone. She's in line to get a ticket, and she runs into the girl that supposedly is her daughter's cover, and she walks up to her and says, hey, what are you guys here to see, or where, where's my daughter? And Camille Tucker would tell the Court that she could tell from the look on this child's face that something was up. And she starts stuttering and stammering and saying, what do you mean? And she says where, where, where's she at? And immediately it is revealed that she's not, in fact, with her, hasn't been with her for some time, and there's no sleep-over planned at her house. So, Camille Tucker picks up her cell phone, calls her daughter, and says, young lady, where are you at? This is like 10:00. The victim in this case is at the defendant's house up on . . . Street, they've had sex already, they went to Applebee's that night, and panic sets in. It is absolute panic. The defendant is, is

panicking; the victim in this case is panicking; and her mom is yelling at her over the phone, saying, where are you?  Well, the defendant shuttles, shuttles our victim into his car and they pack up some of her overnight things, and they start driving around town to drop her off somewhere.  Ms. Tucker keeps her daughter on the phone, says, you are not hanging up; you are staying on the phone with me.  So, what ends up happening is, the victim and the defendant are driving through Radford, they're heading down to the river.  Our 13-year-old victim doesn't know where she's going, but she's giving her mom vague directions over the phone, I see this landmark, I see this landmark.  Her mom jumps into her car with her date, and they are kind of following; they're only a couple of minutes apart.  Eventually, the victim in this case is kicked out to the curb in the middle of the night and left abandoned down by the river at Greenhill Apartments.  She gives her mom the landmark of the Dedmon Center, and gives her mom the landmark of Greenhill Apartments, and using GPS and some mapping software, they're able to find her; she's in a – sitting on a bus stop bench.  She doesn't tell them exactly what has happened; she does not tell them the truth right then and there.  It's only the next day when her father gets involved that he insists they go to the police, the hospital, the police again.  And that is finally how this whole thing gets unraveled.  Our witness, our victim in this case, would identify the defendant; she would point to him and say, he's the one who did these things to her; and this all occurred in the city.

. . . .

Sergeant Caldwell would have been our third witness.  He would have been the one who would have explained the forensic analysis that was done on the phones.  He would explain encryption; he would explain how to un-encrypt something.  He did an excellent job in getting not only the deleted photos off of the victim's phone, but he also was able to somehow get 16 pages of deleted – or encrypted, text messages off the defendant's Blackberry.

Our fourth witness would have been Detective Cross of the Radford City Police Department.  She spoke to the defendant.  The defendant provided a handwritten statement to police.  We would ask the Court to receive as one of our exhibits a – let's see, a seven-page handwritten statement that's been photocopied; it's the defendant's statement he gave police.

. . . .

13

One of the other things we would have had to have proven is that the defendant in this case, Arthur William Jones, II, was over 18 years of age.  He's, in fact, 43, maybe even 44 as we stand here today.  One of the exhibits would have just simply been a one-page piece of paper – it's a DMV printout of a Virginia driver's license showing identifiers such as date of birth, Social Security number, and the name and address of our defendant.  This one-page document we would ask the Court receive as an exhibit.

. . . .

The defendant, as this Court knows, but I'll briefly recite, was interviewed by police over several hours on the date of January 12th, 2014.  Highlights of that interview – and there's a DVD of this interview that is already in the Court's file, so I'm not going to reintroduce another DVD – but the defendant had eight sisters; previously been married; had a 16-year-old daughter himself, knew our victim's last name; actually told police, there's some bad people out there and it's super-dangerous for women; said things to the police, like, when she told me she was 18, I almost cut the brakes; it's getting dangerously close, like, 18 is just whoa close, and I'm going to be super pissed off.  During this interview, he was asked several times – I think five different times he was asked by police, did this relationship start before or after New Year's; a clear time delineator mark.  He was asked over and over, did this happen before or after New Year's, and he says, it was after New Year's once. Asked again later, this before or after New Year's; he says, it had to be after because I didn't meet her until after New Year's.  He actually says, don't contact – he says, I saved text messages from her where she told me she was 18.  The defendant deleted a lot of his text messages, but the two or three or four he saved were the ones he needed should he ever need to prove that she had told him she was 18.  He's asked the third time, when was this, was this in December; and he says no, this wasn't in December, this was after she got back. Fourth time – did you have sex with her before New Year's; no, I think it was after New Year's.  Number five – how many times before New Year's did you have sex; we didn't, it had to be after. He says he saved – all right, so, then about two-thirds of the way through the interview his story changes; does a complete 180.  All of a sudden, halfway or two-thirds of the way through this interview, he knows the exact date that they first met, went to his house, and tried to have sex.  December 2nd rings in my mind, is what he tells the police.  He does corroborate this – and I didn't mention this before, but they actually discussed moving in together, as if they were going to become a permanent item.  He tells the police, yeah, I started telling her, say, listen, if you don't know what you're, you

> don't know what you're going to do, and I have a house; if you don't
> know what you're going to do, I have to pay the bills anyway, if
> you're going to figure out what you're going to do, then, yeah – they
> were actually – he actually was planting in her mind the possibility
> of a long, long, extended relationship that included open and
> permanent cohabitation. . . . That, Your Honor, would have been the
> Commonwealth's evidence.

*Id.* at 142–155.

The trial court then asked the defense if they agreed that this would be the

Commonwealth's evidence. Counsel added the following caveat: "Just to be clear, the texts that

[prosecutor] mentioned about deleting pictures, deleting photos, things of that particular nature,

were sent by the victim to the defendant while he was in the police station. I felt there was

maybe some confusion about that. But it's clear that she sent that to him." *Id.* at 155. The court

acknowledged, saying "Other than that, would you all agree that that would be the

Commonwealth's evidence in these cases?" *Id.* After counsel responded, the court specifically

asked Jones if he agreed, and Jones responded, "Yes, sir, Your Honor." *Id.* The court found

Jones guilty of 68 counts of carnal knowledge; the remaining 29 indictments were *nolle prossed*.

3. Sentencing

Following preparation of a presentence report, the initial sentencing hearing occurred on

May 29, 2015. Probation Officer J. C. Castillo testified for the Commonwealth that he prepared

the presentence report. The number of charges to which Jones pled guilty placed his sentencing

guidelines very high, with a range of 42 years, 10 months, to 68 years, 6 months, with a midpoint

of 57 years, 1 month. Castillo noted that Jones admitted the acts of carnal knowledge but

disagreed with the details of the way the case had been presented in court. *Id.* at 161–163.

In addition to introducing more than 15 detailed letters of support from coworkers,

superiors, former students, and friends (*see* Trial R. at 543–570), the defense called several

character witnesses to testify.  Lt. Col. Henry Bass (Army Reserve), Edward Dickenson of the

Virginia Army National Guard, and Alan St. Jean, Assistant Director of Admissions at Virginia

Tech and retired Army Colonel, all testified about Jones' skill and dedication in the military and

as an ROTC instructor at Virginia Tech and Radford since 2006.  They described him as

hardworking, professional, detail-oriented, and committed to going above and beyond

expectations.  Each noted respect and admiration for Jones, adding that their wives and families

were also comfortable with him and that he had not engaged in any inappropriate behavior with

the cadets he trained or anyone else.  Comb. Tr. at 165–187.

Eugene Ziesel, the Senior Pastor at the church Jones attended in Blacksburg, testified that

Jones attended church very regularly and was involved in outreach activities at the church,

including a co-ed flag football program on Sunday afternoons.  Jones had visited Ziesel's home

often and had trained Ziesel's son, who then entered Special Forces training in the service.  He

had never observed any inappropriate behavior by Jones.  *Id.* at 188–190.

Jones' youngest sister, Shirley Peppler, read a statement on behalf of the family,

describing Jones as a "loving, sincere, compassionate and loyal brother, son, and friend."  *Id.* at

193. She described him as a protective father and devoted to his country and community service.

Following his service in Operation Iraqi Freedom, he was to receive the Bronze Star, but refused

it because he felt that the men and women under his command were the true heroes.  Among his

community service activities, Jones had taught self-defense classes for women.  After reading the

family statement, Ms. Peppler told the court how devastating these events had been for her

brother, concluding:

> I can say with absolute certainty that my brother believed this young
> woman he met was of age.  Learning her true age brought him to his
> knees, flooded and overwhelmed him with nausea, and sucked the
> life right out of him; gutted him.  He is not a predator or a pedophile.

16

> He grew up protecting his sisters, his mother, and then his daughter.
> He always empowered women, fostered their strengths, and it would
> never, ever be in his makeup to knowingly take that away.

*Id.* at 196.

Finally, Dr. Evan Nelson, a clinical psychologist and certified sex offender treatment provider, testified that he had spent more than seven hours across two different interviews with Jones, performing psychosexual testing and risk assessments. He described Jones as a very rule-bound individual of average intelligence with a stellar career history, including in the military. Jones had no prior criminal history, no evidence of substance abuse, no signs of anti-social personality disorder or psychopathy, nor was he a pedophile. Evans further testified that the photo of the victim introduced by the prosecutor showed a well-developed, curvaceous female who did not look like a child. Jones' only static risk factors for reoffending were the commission of the current offenses and that the victim was not related to him. His primary dynamic risk factor was the presence of intimacy issues, starting with a childhood history of "modeled instability." His mother had been divorced three times, and he had two failed marriages of his own. He was desperately seeking intimacy and thought he had found it in the connection he made online with K.T. By the time they met in person, he was so invested in the relationship and desperately wanting it to succeed that he lost his ability to look at the situation objectively and see the warning signs of her age that would have made him realize the wrongfulness of his actions. Dr. Nelson further testified that this intimacy issue would be far more easily treated in therapy than would substance abuse issues, pedophilia, or anti-social personality traits. On the numerous risk-assessment instruments—Static 99, Static 99 Revised, 2002R, and SORAG (Sex Offender Risk Appraisal Guide)—Jones' risk of recidivism was low to very low. *Id.* at 197–226.

17

Following the evidence and arguments of counsel, the court imposed a sentence of 10 years on each count, running ten counts consecutively to each other and the remaining 58 counts concurrent to the consecutive counts, for a sentence of 100 years. The court suspended 55 years for a period of 20 years, 10 years of which were to be on supervised probation, leaving an active prison sentence of 45 years, just above the low end of the guideline range. *Id.* at 246–247.

### 4.  Post-Sentencing Motions

One week after the sentencing hearing, the Clerk of Court notified the sentencing judge that the sentencing pronouncement from the bench incorrectly ascribed active time to three cases that had been *nolle prossed*. The court promptly notified counsel, and the matter was set to clarify the sentencing on July 24, 2015. Defense also filed a motion for reconsideration of the sentencing, to be held at the same time. Trial R. at 654–659. Four days before the scheduled hearing, an additional attorney entered the case as co-counsel for Jones and requested a continuance, which the court granted. *Id.* at 662–669. Counsel then filed a position statement urging the court to apply the rule of lenity to its earlier sentence by discarding the 30 years assigned to the wrong three indictments and sentencing Jones to 70 years with 55 years suspended; alternatively, the defense asked the court to declare a mistrial, vacate the sentence, and allow Jones to withdraw his guilty plea. *Id.* at 671–678.

The parties appeared in court on August 28, 2015, to argue. The court clarified and corrected its original sentencing order, running 10 carnal knowledge charges consecutively at 10 years per charge. On nine of the charges, he suspended 5 years on each; the tenth charge he suspended all 10 years. The remaining 58 charges were sentenced at 10 years, concurrently with the other charges. The court declined to construe the prior sentence differently and denied the

motion for mistrial and vacated sentence. *Id.* at 248–270. The court briefly recessed and prepared the sentencing order at that time. Trial R. at 681–686.

Upon returning to the bench, the court granted the motion to reconsider, noting that he had continued to be bothered by many aspects of the case, including the multiplicity of charges. He ordered the parties to draft an order granting the motion for reconsideration and placing the matter on the docket for a later date, to give him more time to contemplate the sentence. The parties were to return, and the sentence would be pronounced, with no further argument. Comb. Tr. at 271–283. The parties did so, submitting an order vacating the sentence and scheduling the matter for October 23, 2015.

On October 23, 2015, the court suspended 71 years of the 100 consecutive years imposed, leaving Jones to serve 29 years, a sentence well below the guideline range. He noted his reasons for departure as Jones' lack of prior criminal record, his age, and the multiplicity of charges. *Id.* at 284–288. The court entered its final judgment order November 2, 2015. Trial R. at 706–709.

## B. Appeals

Jones appealed the final order to the Court of Appeals, raising five issues: (1) the trial court erred in denying his motion to suppress; (2) the trial court erred in denying his motion to recuse the Commonwealth Attorney; (3) the trial court erred in denying his motion to dismiss vindictive indictments; (4) the trial court committed judicial error by pronouncing sentence on three *nolle prossed* indictments, and the judgment should have been vacated; and (5) the trial court abused its discretion by imposing a disproportionate sentence and thereby violating his due process rights. The court denied the appeal in a per curiam opinion dated July 6, 2016. A three-judge panel further denied the appeal on October 3, 2016.

19

In his delayed appeal to the Supreme Court of Virginia, Jones raised only the first three issues raised in the Court of Appeals. The Court refused the petition on July 3, 2019, and denied a rehearing on October 11, 2019.

## C. Habeas Proceedings

By new counsel, Jones filed a petition for habeas corpus in the Radford Circuit Court on October 8, 2020. Counsel raised 40 issues in the body of the petition, 25 additional issues in a memorandum attached to the petition, and an additional 28 issues raised by Jones in an Affidavit filed with the petition. Affidavits from other friends and family of Jones were also attached to the petition. In defending against the petition, the Attorney General's Office filed a Motion to Dismiss and submitted affidavits from Jones' lead trial counsel, James Broccoletti, and from the trial prosecutor. In a 75-page opinion, the court denied the petition, first finding that the knowing, voluntary, and intelligent nature of the plea had been conclusively established by the plea colloquy (quoted verbatim on pages 4–7 of this opinion), thereby barring claims of alleged ineffective assistance which occurred before entry of the plea. *Jones v. Clarke*, No. CL20-6155, slip op. at 33–34 (Radford Cir. Ct. Oct. 22, 2021). The state habeas court also provided additional independent grounds for dismissing the claims, and I will discuss those grounds, to the extent relevant to my decision, later in this opinion.

Jones appealed the decision of the state habeas court to the Supreme Court of Virginia. By opinion entered October 5, 2022, the court refused his petition for appeal. His petition for rehearing was denied on November 22, 2022. He timely filed his § 2254 petition in this court the next day, raising the following claims:

1. Jones entered an involuntary plea of guilty based on ineffective assistance of counsel, undue pressure from counsel, and misrepresentations of counsel.

2. (a) The trial court failed to determine a factual basis for the plea and wrongly denied an evidentiary hearing.

(b) The charges that Jones was convicted of were multiplicitous, resulting in Jones' wrongful multiple convictions for the same offense, in violation of the Double Jeopardy Clause, and counsel was ineffective for failing to object or even advise Jones of this legal issue.

3. Ineffective assistance of trial counsel in the following respects:

(a) Failing to file an appeal when retained to do so;

(b) Creating a conflict of interest by demanding money from Jones' family to pay for the alleged victim's guardian ad litem;

(c) Forcing Jones to lie in order to enter a guilty plea;

(d) Forcing Jones to waive his right to a trial; and

(e) Causing Jones to waive his attorney-client privilege by forcing Jones to take the stand and disclose in open court what he talked about with his attorney regarding the plea.

4. Counsel had a conflict of interest with Defendant on how to prepare and proceed with the case; Jones wanted to present evidence, call witnesses, and testify, but counsel forbade him to do so.

In the memorandum attached to his petition, Jones made several additional claims:

I. Jones' counsel was ineffective in failing to give Jones notice of the nature of the charges against him or the essential elements of the charges against him.

II. Trial counsel and appellate counsel provided ineffective assistance of counsel in the following ways:

A.  Failed to advise Jones of his right to a trial;

B.  Failed to determine and object to the fact that Jones was being sentenced to a different set of charges than those to which he had pled guilty;

C.  Failed to prepare Jones and witnesses for a trial;

D.  Failed to obtain discovery;

E.  Failed to review the presentence report with Jones to learn of factual inaccuracies and failed to object to those inaccuracies;

F.  Failed to find and investigate crucial witnesses and cell phone records to discredit alleged victim at trial;

G.  Failed to explain the differences between a jury trial and a bench trial;

H.  Failed to advise Jones about the proper sentencing guideline range and affirmatively misinformed Jones of the potential sentence and sentencing guidelines;

I.  The cumulative effect of the above amounted to ineffective assistance of counsel.

III.  Broccoletti provided ineffective assistance of counsel by failing to conduct an adequate investigation, perform adequate legal research, conduct discovery, and investigate whether the sexual encounters in question actually happened.

IV.  Broccoletti, Bennet, and Norment all provided ineffective assistance of counsel by failing to conduct an objectively reasonable investigation of whether the sexual encounters occurred and by allowing retaliation by the prosecutor.

V.  Broccoletti provided ineffective assistance of counsel by failing to thoroughly interview Jones to obtain all the facts and by failing to prepare Jones to testify at trial.

VI.    Broccoletti, Bennett, and Norment failed to provide effective assistance of counsel by failing to present witnesses with personal knowledge of the alleged victim's bad reputation for veracity.

VII.   Broccoletti, Bennett, and Norment provided ineffective assistance of counsel by failing to conduct an objectively reasonable investigation of Jones' defense.

VIII.  Broccoletti, Bennett, and Norment failed to provide effective assistance of counsel by failing to investigate any other potential witnesses.

IX.    Broccoletti, Bennett, and Norment provided ineffective assistance of counsel by failing to object to fatal variances between the indictments and the proof at the plea stage and sentencing stage.

X.     Trial counsel was ineffective in failing to provide Jones notice of the constitutional rights he waived and in failing to inform him that he would have to register as a sex offender.

XI.    Jones was denied his Fifth Amendment due process rights and Sixth Amendment confrontation rights when he was denied the right to be present at all critical stages of the proceedings and trial, where factual issues were discussed and resolved.

XII.   Jones is actually innocent of the crimes for which he was convicted.

XIII.  The trial court erred in denying Jones' motion to recuse the Commonwealth Attorney.

XIV.   Trial counsel was ineffective in advocating for dismissal of Jones' convictions on the grounds of double jeopardy.

XV.    Jones' trial counsel were ineffective in failing to advocate for dismissal of Jones' convictions on the grounds that there was no evidence to corroborate Jones' confession.

XVI.    The trial court erred in failing to run Jones' sentences concurrently and failed to

consider the alleged victim's behavior as a mitigating circumstance.

## II. DISCUSSION

A federal court reviewing a § 2254 petition is limited by the separate but related doctrines

of exhaustion, procedural default, and independent and adequate state law grounds.  A habeas

petitioner is required to exhaust his claims in state court before his claims can be considered in

federal court.  28 U.S.C. § 2254(b)(1)(A).  To exhaust his claims, a petitioner must present his

federal constitutional claims to the highest state court, on the merits, before he is entitled to seek

federal habeas relief.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  Further, the petitioner

must present to the state court the same operative facts and the same controlling legal principles

that he seeks to present to the federal court.  *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995).

A separate but closely related issue is the doctrine of procedural default.  If a state court

has clearly and explicitly denied a petitioner's claim based on a state procedural rule that

provides an independent and adequate ground for the state court's decision, that claim is

procedurally defaulted for purposes of federal habeas review.  *Breard v. Pruett*, 134 F.3d 615,

619 (4th Cir. 1998).  A state procedural rule is independent if it does not depend on a federal

constitutional ruling, and it is adequate if it is firmly established and regularly applied by the

state court.  *Yeatts v. Angelone*, 166 F.3d 255, 263–64 (4th Cir. 1998).  A claim that has not been

presented to the highest state court and would be procedurally barred as untimely or successive if

the petitioner tried to present the issue to the state court now is considered simultaneously

exhausted and defaulted.  *Bassette v. Thompson*, 915 F.2d 932, 936–37 (4th Cir. 1990).

Before a federal habeas court will consider a procedurally defaulted claim or a claim that

is exhausted and defaulted, the petitioner must show both cause for the default and actual

prejudice resulting from the claimed federal violation. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Cause for procedural default requires the existence of some objective factor, external to the defense and not fairly attributable to the prisoner. *Id.* at 756–57. To show prejudice to overcome procedural default, a petitioner must show that the claimed violation worked to his "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982).

Once the above procedural hurdles have been addressed, federal courts reviewing constitutional claims adjudicated on the merits in state court may grant relief on such a claim only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). A decision is contrary to federal law only if it reaches a legal conclusion that is directly opposite to a Supreme Court decision or if it reaches the opposite result from the Supreme Court on facts that are materially indistinguishable from the Supreme Court case's facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state's decision is an "unreasonable application" of federal law only if the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement. *Harrington v. Richter*, 562 U.S. 86, 103 (2011). The question is not whether a federal court believes the state court's decision is incorrect, but whether the decision was unreasonable, which is a "substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). Likewise, the federal court must presume that the state court's factual findings are correct, and this presumption can be overcome only "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Again, the federal court must find

more than just an incorrect determination of facts, as "unreasonable determination of the facts" is a substantially higher threshold." *Schriro*, 550 U.S. at 473.

When reviewing a state court's assessment of ineffective assistance of counsel claims, federal review is "doubly deferential," because the deferential standard of review under the statute overlaps with the deferential standard under *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Most, though not all, of Jones' claims will be evaluated under this doubly deferential standard. Turning now to the numerous claims raised by Jones, for whatever brevity is possible, I will group similar claims together, to avoid repeating applicable law. Thus, some items will not be addressed in the order in which Jones raised them in his petition.

## A. Procedurally Defaulted Claims

The defendants argue that some of petitioner's claims have not been exhausted because he has not argued the same facts and law presented to the state courts. One such claim in the pending § 2254 that was not raised on direct appeal nor in state habeas proceedings is Claim 2(a), that the trial court did not determine a factual basis for the plea and denied an evidentiary hearing.[4] That issue should have been raised first in the trial court at the time of Jones' plea and then pursued on direct appeal. Neither action was taken, and it is now too late to do so. Therefore, this issue is considered "exhausted and defaulted." Jones has offered no reason, good or otherwise, for defaulting this issue, and the court will not consider it.

In Claim 3(b), Jones alleges that defense counsel created a conflict of interest by "demanding money from Jones' family to pay for the alleged victim's guardian ad litem." This issue was not raised previously and is now exhausted and defaulted. Jones has not offered a

---

[4] If the court were to address this issue on the merits, I would find it completely without merit, bordering on frivolous. See the uncontested summary of proffered evidence quoted herein on pages 7–15. Further, no evidentiary hearing was requested at the guilty plea hearing.

good reason for defaulting this issue, nor has he shown any prejudice to his representation.  The court will dismiss this claim.

In Claim 4, Jones alleges that counsel had a conflict of interest because he and Jones did not agree on how to pursue the case.  Jones wanted to go to trial, present evidence, call witnesses, and testify; counsel disagreed.  This issue was not raised previously, at least not as a conflict-of-interest claim, and it is simultaneously exhausted and defaulted.  Jones cannot show prejudice from failing to raise the claim because it is without merit.  In this case, what Jones is describing is not a conflict of interest at all, but a failure to agree on strategy matters.  Further, Jones has not shown that he was prejudiced by the disagreement over strategy, because the record reflects that counsel was prepared for trial and had subpoenaed witnesses.  *See also* Broccoletti Aff't at p. 4.  That counsel may have advised Jones not to testify at trial, and that the outcome of a trial would not be favorable, was not a conflict of interest, but part of a lawyer's duty owed to a client.  A criminal defense lawyer "should advise the accused with complete candor concerning all aspects of the case, including a candid estimate of the probable outcome." *Jones v. Murray*, 947 F.2d 1106, 1111 (4th Cir. 1991) (quoting II American Bar Association Standards for Criminal Justice, Standard 4-5.1).  This claim will be dismissed.

Two of Jones' current claims were raised before the state habeas court and denied because they were not proper issues for habeas in Virginia, as they should have been raised on direct appeal:  Claim XI, alleging violation of Fifth and Sixth Amendment rights by denying him the right to be present at all critical stages of the proceedings, and Claim XVI, alleging that the trial court erred in running sentences consecutively rather than concurrently and in failing to consider the victim's behavior as a mitigating circumstance.  The state habeas court cited the rule in *Slayton v. Parrigan*, that a petitioner may not use habeas corpus to circumvent the trial and

appellate process for challenging non-jurisdictional errors in a judgment of conviction. *Slayton v. Parrigan*, 205 S.E.2d 680, 682 (Va. 1974). The rule of *Slayton v. Parrigan* has long been recognized by the federal court as an independent and adequate state reason for a state habeas court to decline to rule on the merits of a claim. *See, e.g., Prieto v. Zook*, 791 F.3d 465, 468–69 (4th Cir. 2015). Jones did not raise Claim XI until his state habeas case, and the habeas court properly considered it procedurally defaulted under Virginia law.

Jones raised challenges to his sentencing on his direct appeal to the Court of Appeals of Virginia, but he did not pursue that issue in the Supreme Court of Virginia. By not doing so, he failed to fully exhaust that issue, and the state habeas court refused to allow him to raise it in habeas instead of on appeal. The issue is procedurally defaulted and simultaneously exhausted. Jones has offered no cause or explanation for the procedural default of either Claim XI or Claim XVI, and this court will not consider these claims.

**B. Claims Preceding Jones' Guilty Plea**

When a defendant has pled guilty in open court, he may not thereafter raise claims relating to alleged violations of constitutional rights that arose before his entry of the plea; he may only challenge the voluntary and intelligent character of the plea. *Tollett v. Henderson*, 411 U.S. 258, 267 (1973). A guilty plea is "a break in the chain of events" between what happened before the plea and what happens after. *Id.* Some (but not all) of Jones' claims of ineffective assistance of counsel could influence a defendant's decision to plead guilty, so I will address those first.

**1. Validity of Jones' Guilty Plea**

Jones alleges in his first claim (Claim 1) that his guilty plea was entered involuntarily, based on undue pressure and misrepresentations of counsel. The state habeas court found Jones'

plea to be knowing, intelligent, and voluntary, based on the thorough plea colloquy conducted at

the time of the plea, quoted verbatim herein on pages 3 through 7 above.  The court also

considered an affidavit from Jones and a contradictory affidavit from his trial counsel,

Broccolotti.  Habeas R.[5] at 216–223.  Under Virginia law, a habeas court is permitted to consider

affidavits as substantive evidence, in lieu of holding a hearing.  Va. Code § 8.01-660; *Yeatts v.*

*Murray*, 455 S.E.2d 18, 21 (Va. 1995).  This procedure does not implicate the right to confront

and cross-examine, because habeas matters are civil suits, not criminal.  Further, the state habeas

judge presided over the original guilty plea and had the opportunity to observe the demeanor of

the defendant and his attorneys.  The court found as a matter of fact and law that the guilty plea

was knowing and voluntary. This court is required by statute to presume that the state habeas

court's factual findings are correct, and the presumption can be overcome only by "clear and

convincing evidence."  28 U.S.C. § 2254(e)(1).  Jones has offered nothing that remotely suggests

that the state court's factual findings are wrong, much less anything that would meet the clear

and convincing evidence standard.

The state habeas court also reasonably applied the law.  The court relied on *Anderson v.*

*Warden* for the proposition that the truth and accuracy of a defendant's statements during a plea

colloquy "will be considered conclusively established" by the proceeding, unless he offers a

compelling reason why he should be permitted to contradict his earlier statements.  *Anderson v.*

*Warden*, 281 S.E.2d 885, 888 (Va. 1981).  The law in federal court is the same: "[A]llegations in

a [habeas petition] that directly contradict the petitioner's sworn statements made during a

properly conducted [plea] colloquy are always 'palpably incredible' and 'patently frivolous or

false.'"  *United States v. Lemaster*, 403 F.3d 216, 221 (4th Cir. 2005) (citations omitted).  Jones'

[5] Citations herein to "Habeas R." refer to the records of the state habeas proceeding in Radford Circuit
Court, *Jones v. Clarke*, No. CL20-6155, using the typewritten numbers in the lower right corner of the page.

statements during the colloquy included that he decided for himself how to plead, after his discussions with counsel, that he was entering his plea freely and voluntarily, and that he was in fact guilty of the crimes charged.  Comb. Tr. at 138–139.

Although ruling that the guilty plea foreclosed claims of ineffective assistance of counsel that pre-dated the plea, he also addressed alternative grounds for denying those claims.  I will address here those claims that, if adequately proved, could affect the voluntariness of Jones' guilty plea.  If a petitioner enters a guilty plea based on the advice of counsel, the plea may be considered involuntary if based on advice that constitutes ineffective assistance of counsel.  A person may be satisfied with his attorney at the time of a plea if he does not then know that the attorney has rendered ineffective assistance.  Under this standard, voluntariness of the plea depends on whether counsel's advice was objectively unreasonable and whether, but for counsel's unreasonable errors, the outcome would have been different.  *Hill v. Lockhart*, 474 U.S. 52, 57–58 (1985).

**Claims 3(c) and 3(d).**  Jones alleges in these claims that his attorney told him to lie during the plea colloquy and forced him to waive his right to trial.  This contradicts the statements in his plea colloquy and contradicts Broccoletti's Affidavit.  Habeas R. at 217.  The habeas court reasonably determined, as a matter of fact, that Broccoletti did not tell Jones to lie and say he was guilty, nor did Broccoletti mislead Jones on the potential outcome of the case.  *Jones*, slip op. at 58–60.

**Claim I.** Jones alleges that counsel did not explain the nature of the charges to him nor the essential elements of the offense.  As the state habeas court noted, this claim was contradicted by Jones' responses to the plea colloquy, in which he acknowledged that he fully understood the charges, had discussed the charges and their elements with his attorney, and understood what the

Commonwealth would have to prove to convict him.  Comb. Tr. at 138.  *See also* Broccoletti

Aff't at p. 4.  The habeas court's factual determination is reasonable and supported.

*Claims II(A) and (G).*  Jones contends that counsel failed to advise him of his right to

trial and failed to explain the difference between a jury trial and a bench trial.  Again, as noted by

the state habeas court, this allegation is contradicted by Jones' answers to the plea colloquy, in

which he confirmed that he wished to waive his right to a jury, "12 people from the community

who would have to unanimously find you guilty."  Comb. Tr. at 139.  Broccoletti also

"categorically and unequivocally denied" failing to advise Jones about his right to trial.

Broccoletti Aff't at p. 4.  He further explained that they had discussed at length that any trial

would be with a jury, because the prosecutor had demanded a jury trial.  *Id.*  The state habeas

court's factual determination that Jones had been properly advised of his right to trial was a

reasonable determination of fact.

*Claim II(H).*  Jones claims that counsel failed to advise him about the proper sentencing

guideline range and affirmatively misinformed Jones of the potential sentence and sentencing

guidelines.  Counsel asserts that he explained to Jones that each count of carnal knowledge

carried a penalty range of 2–10 years, and the jury would have to impose at least 2 years on each

count, plus 35 years of mandatory minimum time on the other charges.  Broccoletti Aff't at p. 2.

In the plea colloquy, Jones affirmed understanding that the court could impose a maximum

sentence of 680 years on the charges to which he was pleading guilty and that he had discussed

sentencing guidelines with his attorney.  Comb. Tr. at 140–141.  Based on these facts, Jones has

failed to establish that counsel misinformed him of the potential sentence.  The state habeas court

reasonably found that Jones could show no prejudice even if counsel misadvised him, because

once the court informed him of the maximum sentence he faced, he could not thereafter be

prejudiced by any misinformation previously provided by counsel.  *United States v. Foster*, 68 F.3d 86, 88 (4th Cir. 1995).

    *Claim X.*  Jones alleges that trial counsel was ineffective in failing to provide him notice of the constitutional rights he waived and in failing to inform him that he would have to register as a sex offender.  In Jones' plea colloquy with the court, the court reviewed with him that by pleading guilty, Jones was waiving his constitutional right to trial by jury, his right not to incriminate himself, his right to confront and cross-examine his accusers, his right to appeal, and basically, his right to defend himself.  Comb. Tr. at 139–142.  Jones also acknowledged understanding that he would be required to register as a violent sexual predator.  *Id.* at 141.  The state habeas court reasonably found that, even if counsel failed to advise Jones, he suffered no prejudice because he was correctly informed by the court.  *Jones*, slip op. at 69.

    Having found no ineffective assistance of counsel on the above claims and that Jones' plea was knowing and voluntary, the state habeas court turned to the prejudice prong, that the outcome would have been different had Jones been properly advised.  In claims alleging that the defendant would not have pled guilty but for counsel's advice, to prove prejudice, a petitioner "must convince the court that a decision to reject the plea bargain would have been rational under the circumstances."  *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010).  This requires an objective analysis of the pertinent facts.  *United States v. Fugit*, 703 F.3d 248, 260 4th Cir. 2012).

    The other pertinent facts in this case include Jones' video-recorded and written statements to the police that he had engaged in sexual acts with the alleged victim, including intercourse, fellatio, cunnilingus, and digital penetration.  Although counsel tried to suppress the statement, the trial court had ruled that it was admissible.

The alleged victim had seriously misrepresented her age for a long time on several sites that were restricted to adult users.  Unfortunately for Jones, that is not a defense in Virginia. *Rainey v. Commonwealth*, 193 S.E. 501, 502 (Va. 1937) (holding that "the statute does not require that the accused must possess knowledge of the victim's age when the sexual act takes place in order to constitute the crime of statutory rape."); *Kilpatrick v. Commonwealth*, 857 S.E.2d 163, 175 (Va. Ct. App. 2021) (citing *Rainey* for proposition that knowledge of victim's age is not an element of attempted statutory rape), *rev'd on other grounds*, 876 S.E.2d 177 (Va. 2022).  As defense counsel stated, Jones' argument "was always that he thought she was 18 years of age which we told him was not a defense to carnal knowledge in Virginia."  Broccoletti Aff't at p. 2.  Even under a "knew or should have known" standard, ample evidence could support a finding that he should have known she was under age: she went from claiming to be 24 to 23 to 21, and finally, to 18; she was clearly a virgin when he first attempted intercourse with her; he was the father of a 16-year old daughter; he grew up with several sisters; he always picked the victim up at night down the street from her house and dropped her back off early—before 4:30 a.m.; he knew her mother had taken her cell phone away and that she had no car or driver's license; and he admitted having concerns about her age. Based on his admissions of having sexual activity with her and the fact that her true age was 13, the evidence clearly would support conviction.

Under Virginia law each individual act of carnal knowledge, each separate penetration, is a separate offense.  *Paduano v. Commonwealth*, 766 S.E.2d 745, 748 (Va. Ct. App. 2014). Accordingly, the Commonwealth had charged 68 counts of carnal knowledge, each carrying a potential sentence of 2 to 10 years in prison.  Additionally, he faced numerous other charges: 21 charges of taking indecent liberties with a minor, carrying a penalty of 1 – 5 years in prison or up

to 12 months in jail; three charges of possession of child pornography, carrying a penalty of 1 – 5 years in prison or up to 12 months in jail for a first offense and 1 – 10 years in prison or up to 12 months in jail for a second or subsequent offense; one charge of using a computer system to solicit a minor at least seven years younger than himself, carrying a mandatory minimum sentence of 5 years, up to a maximum of 30 years; and three charges of enticing a minor at least seven years younger than himself to perform in child pornography, carrying a mandatory minimum sentence of 5 years, up to a maximum of 30 years, for the first offense and a mandatory minimum of 15 years, up to a maximum of 40 years, for a second or subsequent offense.

Finally, the Commonwealth Attorney had requested a trial by jury.  Although a defendant has the right to insist upon a jury trial, as counsel had advised him, he has no *right* to waive a jury trial unless the prosecutor and the court agree to allow a bench trial.  Va. Code § 19.2-257. Under the law in effect at the time of Jones' prosecution, if a jury determined a defendant's guilt, the jury also set the punishment.  Va. Code § 19.2-295 (effective July 1, 2007 to June 30, 2021). The jury received no information about sentencing guidelines or typical sentences in similar cases.  Va. Code § 19.2-298.01(A).  Further, the jury was not given the option to suspend any portion of the sentence imposed.  By law, sentences on multiple charges are to run consecutively, not concurrently, unless otherwise ordered by the court.  Va. Code § 19.2-308.  Under this system, jury sentences were often excessively harsh, and trial judges rarely reduced those sentences, resulting in academic criticism of jury sentencing, although the courts never declared it unconstitutional.  Caleb R. Stone, Note, *Sentencing Roulette: How Virginia's Criminal Sentencing System is Imposing an Unconstitutional Trial Penalty That Suppresses the Rights of Criminal Defendants to a Jury Trial*, 23 Wm. & Mary Bill Rts. J. 559, 559–60 (2014).

34

Given the factual and procedural posture of the case in early February 2015, Jones was facing a jury trial in which the evidence amply supported a conviction. On the 68 carnal knowledge charges alone, if the jury gave only the minimum sentence they would be instructed to give, the minimum sentence of 2 years on each charge, the total sentence would be 136 years, none of which would be suspended. This would not count the potential 40 years of mandatory minimum sentences on the computer solicitation and enticement charges, nor would it count the sentences on the indecent liberties or possession of child pornography charges. An attorney would reasonably be expected to advise a defendant in Jones' situation that the odds of conviction were high and that he would face a sentence of at least 176 years if convicted. By pleading guilty and having 29 charges dismissed, the sentencing guidelines would recommend a sentence between 42 years, 10 months, and 68 years, six months, with a midpoint of 57 years, 1 month, and Jones would be able to request a below-guideline sentence. An objective analysis of these facts does not support the claim that Jones would have insisted on going to trial if he had been given different advice on the risks of trial. It is not enough for him to say now that he would have gone to trial had he be given different advice. *Christian v. Ballard*, 792 F.3d 427, 452 (4th Cir. 2015). Objectively, the state habeas court found no prejudice, reasonably concluding that "no reasonable defendant would have insisted on pleading not guilty on all 90 charges, facing hundreds of years in prison and some charges carrying a cumulative mandatory minimum sentence of 35 years in prison." *Jones*, slip op. at 49.

For the reasons stated, the claim that his plea was involuntary because of ineffective assistance of counsel, as alleged in Claims 1, 3(c), 3(d), I, II(A), II(G), II(H), and X will be dismissed.

### 2. Ineffective Assistance Claims no Longer Cognizable

Jones has alleged several claims of ineffective assistance of counsel during investigation and trial preparation. These claims can no longer be brought in habeas after entry of defendant's voluntary guilty plea, as the state habeas court reasonably ruled. *Tollett*, 411 U.S. at 267.

***Claims Alleging Failure to Investigate.*** Jones asserts that counsel provided ineffective assistance by: failing "to find and investigate crucial witnesses and cell phone records to discredit alleged victim at trial" (Claim II(F)); failing to conduct an adequate investigation, perform adequate legal research, conduct discovery, and investigate whether the sexual encounters in question actually happened (Claim III); failed to conduct an objectively reasonable investigation of whether the sexual encounters occurred (Claim IV); failed to thoroughly interview Jones to obtain all the facts (Claim V); failing to conduct an objectively reasonable investigation of Jones' defense (Claim VII); and failing to investigate other potential witnesses (Claim VIII). As an alternative basis for his rulings, the state habeas court noted that these claims were conclusory and insufficient to establish ineffective assistance of counsel. *Jones*, slip op. at 41. The state habeas court's determination is a reasonable application of federal law. When a prisoner alleges that counsel conducted an inadequate investigation "to discover persons who would testify in his favor," but does not identify who those witnesses are or what they would have said, he cannot show ineffective assistance. *Bassette v. Thompson*, 915 F.2d 932, 941 (4th Cir. 1990); *see also Beaver v. Thompson*, 93 F.3d 1186, 1195 (4th Cir. 1996) (stating that "an allegation of inadequate investigation does not warrant habeas relief absent a proffer of what favorable evidence or testimony would have been produced.").

The state habeas court also noted that defense counsel was aware of and argued the alleged victim's deception about her age and her use of adult online dating sites since the age of

11 or 12.  The state habeas court commented on the strategic reasons that counsel would choose

not to introduce cumulative evidence of this fact, because that could backfire, being seen as a

"blame the victim" approach.  *Jones*, slip op. at 47–48.  Further, because knowledge of her age is

not a defense, cumulative evidence on this issue would likely have been precluded at trial as

irrelevant; the trial court had already denied counsel's motion to introduce evidence on

reasonable mistake of age.  Trial R. at 501.  Likewise, evidence that she was flirting with and

lying to other men about her age would likely be inadmissible on relevance grounds and under

Virginia's "rape shield" statute, which prohibits reputation or opinion evidence about a

complaining witness's "unchaste character or prior sexual conduct," except in limited

circumstances not applicable to this case.  Va. Code § 18.2-67.7.

Finally, the state habeas court observed that Jones told his counsel the same version of

events that he told the police in the videotaped and written statements, and he gave the same

account of events to the Defense expert, Dr. Evan Nelson.  He admitted multiple occasions of

sexual activity with the victim, which he described in detail, but he could not remember specific

dates.  *Jones*, slip op. at 56.  When a defendant has made statements to counsel indicating the

truth of his confession to police, counsel is not unreasonable in deciding not to investigate

whether the offense happened or whether it was committed by someone else.  *Mueller v.*

*Angelone*, 181 F.3d 557, 580 (4th Cir. 1999) ("when a defendant has given counsel reason to

believe that pursuing certain investigations would be fruitless or even harmful, counsel's

decision not to pursue those investigations may not be challenged as unreasonable.").

For the reasons stated, the failure to investigate allegations in Claims II(F), III, IV, V, VII,

and VIII will be dismissed.

*Trial Preparation Claims.*  Jones contends that counsel was ineffective in the following: failing to prepare Jones and witnesses for trial (Claim II(C)), failing to obtain discovery (Claim II(D)), and failing to present witnesses with knowledge of the victim's bad reputation for veracity (Claim VI).  In addition to finding these issues rendered irrelevant by his guilty plea, the state habeas court determined as a matter of fact that counsel conducted discovery, subpoenaed witnesses to trial, and was present with those witnesses and ready to proceed with trial when Jones decided to plead guilty.  *Jones*, slip op.at 55–57.  The court record, the transcripts, and Broccoletti's Affidavit support the reasonableness of the state court's factual findings.  Claims II(C), II(D), and VI will be dismissed.

*Other Pretrial Ineffective Assistance Claims.*  Jones alleged that counsel forced him to waive his attorney-client privilege by taking the stand to testify "in open court what he talked about with his attorney regarding the plea."  Claim 3(e).  The entire testimony on the plea agreement was that counsel met with Jones on January 16, 2015, to review a plea agreement offer made by the Commonwealth Attorney on January 15.  Counsel asked Jones if he had gone over the agreement with counsel fully and completely, but he did not ask about the terms of the agreement, any advice counsel may have given, or any specific questions Jones asked.  He asked Jones if he had decided to accept or reject the offer.  Jones said he had rejected it, freely and voluntarily, with no force or duress by counsel.  Comb. Tr. at 123–124.

In his state habeas, Jones raised this claim as a "conflict of interest" claim, which the state habeas court rejected, finding neither a conflict of interest nor ineffective assistance of counsel.  The state court's application of law was reasonable.  The attorney-client privilege is narrowly construed.  The relationship of attorney and client does not create a presumption that every communication between them is confidential. *United States v. Elbaz*, 396 F. Supp. 3d 583,

597 (4th Cir. 2019). The privilege only applies to those communications intended to be confidential. *Id.* at 598. Any privilege is waived when the client intends for the attorney to provide the information to another. *Id.* Defense counsel would necessarily have to communicate rejection of the offer to the Commonwealth Attorney. Thus, there would be no privilege attached to Jones' rejection of the plea after consultation with counsel. Because counsel did not force Jones to disclose privileged information, there was no deficient performance, nor was there any prejudice, and I will dismiss this claim.

In Claim 2(b), Jones alleges that counsel was ineffective for objecting to the indictments on the grounds of multiplicity and double jeopardy. In addition to finding this claim barred by his guilty plea, the state habeas court noted that counsel did argue duplicity and multiplicity of indictments. Comb. Tr. at 257, 277. However, the law did not support the argument. *See Paduano*, 766 S.E.2d at 750 (holding that "each act" included in the carnal knowledge statute "is sufficient in and of itself to support a conviction," and defendant was not entitled to have his sentences run concurrently under the rule of lenity for separate convictions for animate penetration and sexual intercourse during a single ongoing sexual encounter.). Accordingly, there was neither deficient performance nor prejudice. The state habeas court's factual determinations and application of the law were reasonable, and I must dismiss this claim.

In Claim IV, Jones argued that counsel was ineffective for allowing retaliation by the prosecutor. The state habeas court noted that defense counsel filed a Motion to Dismiss the December 2014 indictments on the grounds of prosecutorial vindictiveness, which the court overruled. Because counsel capably filed and argued the motion, there was no ineffective assistance of counsel. The state habeas court noted that Jones' unhappiness with the result does not mean that counsel was ineffective, citing *Lawrence v. Branker*, 517 F.3d 700, 716 (4th Cir.

39

2008) (noting that "effective trial counsel cannot always produce a victory for the defendant."). The state court's decision was not unreasonable, and I must dismiss this claim.

### 3. Objections to Pretrial Ruling Barred by Guilty Plea

Jones alleges that the trial court erred in denying his due process motion to recuse the Commonwealth Attorney. He exhausted this claim on direct appeal to the Supreme Court of Virginia, which affirmed the Court of Appeals without a reasoned opinion. The Court of Appeals of Virginia had held that the motion and the court's ruling preceded Jones' decision to plead guilty. His guilty plea waived the ability to challenge the ruling later. *Jones v. Commonwealth*, No. 1767-15-3, slip op. at 2 (Va. Ct. App. July 6, 2016). Because the written opinion of the Court of Appeals is the last reasoned state court opinion, this court "looks through" the Supreme Court of Virginia's refusal of the appeal and reviews the reasoning of the Court of Appeals. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) (holding that federal habeas court must presume that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."). The state court opinion was a reasonable determination of facts and application of law, and I must dismiss this claim.

### C. Post-Plea Ineffective Assistance of Trial Counsel Claims

### 1. Failing to Object to Fatal Variances Between the Indictments and Proof

In Claim IX, Jones alleges that all trial counsel were ineffective for "failing to object to fatal variances between the indictments and the proof at the plea stage and sentencing stage." He fails to explain what "variances" he believes existed. Typically, variance between the indictment and proof is said to exist when the evidence at trial is different from and irrelevant to the elements of the crime charged in the indictment. *Scott v. Commonwealth*, 636 S.E.2d 893, 895

(Va. Ct. App. 2006). In the present case, there was no trial. The evidence proffered supported the charges to which Jones pled guilty, and Jones acknowledged that such evidence would have been presented if the matter had gone to trial. Because there was no fatal variance to object to, there was no ineffective assistance, and this claim has no merit and will be dismissed.

### 2. Failing to Seek Dismissal of Convictions on the Grounds of No Evidence to Corroborate Jones' Confession

Claim XV alleges that counsel were ineffective because they did not move to set aside the convictions on the grounds that there was no evidence to corroborate Jones' confession. There is a rule "that an extrajudicial confession of an accused that he committed the offense with which he is charged is not, alone and uncorroborated, adequate proof of the *corpus delicti*." *Aldridge v. Commonwealth*, 606 S.E.2d 539, 554 (Va. Ct. App. 2004). First, the convictions were not based upon Jones' extrajudicial confession; the convictions were based upon his solemn pleas of guilty in open court. Second, the pleas were supported by ample corroborating evidence, including the anticipated testimony of the 13-year-old young woman and the text messages and photographs on the parties' cell phones. Further, when a defendant has given a full and detailed confession, such as the one Jones gave to police, the Commonwealth need not corroborate the entire confession; only slight corroboration is needed. *Id.* at 555. The anticipated evidence, had the case gone to trial, was far more than slight corroboration. This claim must be dismissed.

### 3. Failing to Move to Set Aside the Convictions on the Grounds of Double Jeopardy.

In Claim XIV, Jones asserts that counsel were ineffective in failing to challenge his convictions on double jeopardy grounds. As asserted in Broccoletti's Affidavit, double jeopardy did not apply to the facts of this case. Double jeopardy does not apply if an accused is subjected to two punishments for two carnal knowledge charges that are supported by separate and distinct

acts.  *Paduano*, 766 S.E.2d at 749.  Filing a double jeopardy motion, whether before or after the

plea and conviction, would have been futile, and counsel is not required to file futile motions.

*Moody v. Polk*, 408 F.3d 141, 151 (4th Cir. 2005).  I will dismiss this claim.

### 4.  Ineffective Assistance at Sentencing Claims

Two of Jones' claims allege ineffective assistance of counsel at the sentencing phase.  In

Claim II(E), he alleges that counsel failed to review the presentence report with him to learn

about inaccuracies in the report, and thereafter, failed to object to those inaccuracies.  Claim

II(B) contends that counsel was ineffective in failing to recognize and object to Jones being

sentenced for different offenses from the ones to which he pled guilty.  Both claims were denied

by the state habeas court.

Regarding inaccuracies in the presentence report, the state habeas court noted that Jones

failed to identify any aspect of the report that was incorrect or how he was prejudiced by such

inaccuracy, finding that failure fatal to his claim.  *Jones,* slip op. at 61.  This was a reasonable

application of federal law.  *See Mueller v. Angelone*, 181 F.3d 557, 580 (4th Cir. 1999) (finding

that habeas petitioner's failure to identify what reasonable investigation would have discovered

was fatal to his claim).  The court added that counsel advised the court that he had reviewed the

report with Jones before the hearing, and Jones did not dispute counsel's statement.  *Jones*, slip

op. at 61.  This was a reasonable determination of the facts.  This claim must be dismissed.

As for counsel's failure to recognize and object to the court sentencing Jones for the

wrong offenses, the state habeas court noted that no sentencing order was incorrectly entered.

From the bench, the court had stated that he was sentencing Jones on the 68 counts of carnal

knowledge to which Jones had pled guilty.  He ran the sentences concurrently except for ten of

the charges.  In reading sequential case numbers into the record, he inadvertently listed three case

numbers from the 29 charges that had previously been nolle prossed. The error was caught before the judgment order was typed up. Defense counsel took the opportunity to file several motions, including a motion to vacate the convictions because of judicial error and a motion for sentence reduction. The habeas court determined that counsel's performance was not deficient and that no prejudice occurred to Jones from the temporary numerical error. *Jones*, slip op. at 26–29. The court's findings of fact and determination of law were reasonable, and I will dismiss this claim.

### 5. Cumulative Effect of Errors

In Claim II(I), Jones asserted that the cumulative effect of counsel's errors amounted to ineffective assistance of counsel. As recognized by the state habeas court, acts and omissions which do not constitute ineffective assistance of counsel individually cannot be added together to create a constitutional violation. *Fisher v. Angelone*, 163 F.3d 835, 852–53 (4th Cir. 1998). This claim will be dismissed.

### 6. Failing to File Appeal

In Claim 3(a), Jones alleges trial counsel was ineffective in failing to file a notice of appeal. Jones was represented by appointed counsel on appeal, and the Court of Appeals addressed his appellate claims of error. The Supreme Court of Virginia refused his subsequent appeal. Regardless of whether trial counsel filed the notice of appeal, there was no prejudice to Jones because his appeal was considered by the courts. I will dismiss this claim.

## D. Actual Innocence

Actual innocence is not, by itself, a constitutional claim or grounds for federal habeas relief. *Herrera v. Collins*, 506 U.S. 390, 400 (1993). Actual innocence becomes relevant only when credible new evidence of actual innocence, sufficient to persuade the court that a

conviction based on a trial with constitutional errors must be re-examined, allows a petitioner to proceed with a constitutional claim that would otherwise be untimely or defaulted. *Schlup v. Delo*, 513 U.S. 298, 316 (1995). In the absence any such constitutional claim or error, actual innocence is not grounds for habeas relief. Under the facts of this case, where Jones pled guilty and his guilty plea was supported by his confession, the more recent statements of the victim, and by the contents of Jones' cell phone, even if an error of constitutional dimensions existed in the record, persuading a court that there is new evidence of actual innocence, previously unavailable, would be a tall order indeed. I will dismiss this claim.

### III. Conclusion

For the reasons stated herein, the court will grant the respondent's Motion to Dismiss the § 2254 petition and will deny a certificate of appealability. An appropriate order will be entered this day.

Enter:  March 27, 2025

/s/ *Robert S. Ballou*

Robert S. Ballou
United States District Judge